MEMBERS OF the BRIDGEPORT HOUSING AUTHORITY POLICE FORCE et al., Plaintiffs-Appellees,

v.

CITY OF BRIDGEPORT et al., Defendants-Appellants,

and

Bridgeport Police Union, Local 1159, AFSCME, Council No. 4, Intervenor-Defendant-Appellant,

and

Gregory Iacovetti et al., Intervenors-Defendants-Appellants.

Nos. 1521, 1539 and 1540, Dockets 80–7488, 80–7506 and 80–7518.

United States Court of Appeals, Second Circuit.

Argued July 25, 1980.

Decided April 20, 1981.

Thomas W. Bucci, Bridgeport, Conn., for defendants-appellants.

J. Daniel Sagarin, Milford, Conn. (William B. Barnes and Harrigan, Hurwitz, Sagarin & Rutkin, P.C., Milford, Conn., on brief), for individual intervenors-defendants-appellants.

W. Paul Flynn, New Haven, Conn. (Kopkind, Flynn & Raccio, P.C., New Haven, Conn., on brief), for intervenor-defendant-appellant Bridgeport Police Union, Local 1159.

David N. Rosen, New Haven, Conn., for plaintiffs-appellees.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and NEAHER *, District Judge.

NEWMAN, Circuit Judge:

This is an appeal from a judgment of the District Court for the District of Connecticut (T. F. Gilroy Daly, Judge), 499 F.Supp. 760, finding that the City of Bridgeport has discriminated against members of the Bridgeport Housing Authority Police Force ("Housing Police") because their terms and conditions of employment are less favorable than those of members of the City's Police Department. See 85 F.R.D. 624 (D.Conn. 1980) (ruling on preliminary injunction). The Court found the City to be in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976); 42 U.S.C. §§ 1981 and 1983 (1976); the Demonstration Cities and Metropolitan Development Act of 1966 (Model Cities Act), 42 U.S.C. § 3301 et seq. (1976); and the Comprehensive Employment and Training Act (CETA), 29 U.S.C. § 801 et seq. (1976), as amended by CETA Amendments of 1978, Pub.L.No.95–524, 92 Stat.1909. The Court ordered a broad remedy, including incorporation of the Housing Police members into the Police Department with full employee benefits, back pay, and civil service status. We conclude that the only statute violated was the Model Cities Act, for which the remedy is simply the conferring of civil service status. We therefore vacate in part and remand.

---

* The Honorable Edward R. Neaher of the United States District Court for the Eastern District of New York, sitting by designation.

*Facts*

The Housing Police began providing security for the City's public housing projects on a full-scale basis after 1970, when federal funds for such employment were received under the Model Cities Act by the Bridgeport Housing Authority, which administers the City's seven public housing projects. The Housing Police expanded to 52 members in 1974, the last year in which any officers were hired; the force currently has 27 members, all of whom are Black or Hispanic.

The Bridgeport Police Department numbers 400 officers. In 1975 the examination administered by the City for employment as police officer was successfully challenged as a discrimination against minorities, and quota hiring was ordered. *Bridgeport Guardians v. Members of the Bridgeport Civil Service Commission*, 354 F.Supp. 785 (D.Conn.), *aff'd in part and rev'd in part*, 482 F.2d 1333 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). As a result of that litigation, and two subsequent selection tests, minority representation on the force has risen from 3 percent to 13 percent. Virtually all the Housing Police members who are plaintiffs-appellees in this case took the subsequent examinations but did not achieve a passing score. However, ten former members of the Housing Police passed the exams and have been appointed to the Police Department. The constitutionality of these examinations is not challenged in this lawsuit.

Funding for the Housing Police came primarily from the Model Cities Act, which expired in 1975. At that time, the City assumed responsibility for financing the Housing Police for one year but thereafter refused to continue that funding for budgetary reasons. The Housing Police were then funded as CETA participants, supplemented by City funds received under the "block grant" provisions of the Community Development Act (CDA), 42 U.S.C. § 5301 *et seq.* (1976). Appellees' eligibility for CETA financing expired at the end of 1979. They have continued to receive their salaries during this litigation through the block grant funds, with no guarantee from the City of a permanent place in its budget.

The Housing Police receive training in classes equal in length and content to that of the City Police,[1] and perform the duties of police officers within the low-income, high-crime areas they serve. The District Court found, based on uncontradicted testimony concerning the nature and quality of appellees' work, that the Housing Police performed identical services with competence equal to that of City Police officers.

The salient difference between the two forces is the basis on which hiring decisions are made. Hiring for the Housing Police followed the guidelines of the Model Cities Act, which required selection by a committee of residents of the model cities neighborhoods and a member of the City Police Department. The selection committee carried out the Act's policies of both affirmative action with respect to minority members and preference for neighborhood residents. The Police Department, under the City's standard civil service practices, hires applicants strictly in accordance with the ranking of their passing scores on a written examination. Reflecting this difference in the method of initial selection, the two entities have been treated as entirely separate units. The Housing Police are paid substantially less than the officers of the Police Department,[2] and lack the job security, pension benefits, and procedural protections available to the regular police force.

---

1. Housing Police hired prior to 1970 were not formally trained. Before 1970, all police protection for the housing projects was provided by the Police Department, supplemented by a small group of no more than seven Housing Authority Special Police officers. This group expanded into the current Housing Police when federal funds were received. After 1970, the Housing Police took the City's police training course, which virtually all completed. The course lasted up to 16 weeks full-time, depending on the particular program in effect at the time for the City's police officers.

2. In 1977, for example, a veteran Housing Police officer received $10,000 for a 40-hour week, while a comparable Police Department officer received $15,000 for a 32-hour week.

*The District Court's Decision*

The District Court found the City[3] liable for discrimination against the appellees in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) (1976). The Court found that discrimination had been established under both the disparate impact and disparate treatment theories of liability and that the discrimination was intentional. The Court emphasized that members of the two forces received the same training and performed the same duties, yet the Housing Police received pay and benefits significantly less than those of the Police Department. This disparate treatment of the two forces was found to have a disparate impact on minorities because the minority percentage of the Housing Police is 100% and the minority percentage of the Police Department is 13%. The critical aspect of the Court's decision concerns the rejection of the City's justification for maintaining the two forces with their different benefit provisions. The City had contended that higher benefits were available to the Police Department not because of the racial composition of that force but solely because all members of that force had successfully completed the required civil service examination, whereas members of the Housing Police had not passed any qualifying examination. The District Court rejected the legitimacy of the City's justification because of Section 6 of Bridgeport's City Charter.

Section 6, reprinted in the margin,[4] provides that when the City "absorbs or assumes operation of an enterprise or function ... performed by" the federal government, the state or some subdivision thereof, the employees considered essential to its operation and employed for at least one year are to be "retained without preliminary or performance tests." The Court found that the City had assumed the federal government's function in funding the Housing Police, whose members were all essential to its operation, and that under the Charter, this precluded the City from requiring appellees to take an entry exam, the alleged basis for the City's distinction between the two forces.

**3.** Other defendants named in appellees' complaint, which was first filed in 1977, included the Civil Service Commission, Board of Police Commissioners, Bridgeport Housing Authority, United States Department of Labor and United States Department of Housing and Urban Development. The District Court granted plaintiffs-appellees' motion for a bifurcated trial, and on the issue of liability, found for the federal defendants on all counts, and for the Housing Authority on all counts but the Model Cities Act claim, holding the Authority liable for failure to attempt to effect compliance with that Act. The Court held the City and its officers liable for intentional discrimination on all counts. Appellants Bridgeport Police Union, Local 1159 and individual officers of the Police Department intervened as defendants only at the remedial stage of the proceedings.

**4.** Section 6. Any person holding a position in the classified service when this act shall take effect, with the express exception of employees and officers of the department of public welfare and all of its branches and divisions, who shall have served in such position for a period of at least three months, shall be retained without preliminary or performance tests, and shall thereafter be subject in all other respects to the provisions of this act. Any others in the classified service at the time this act shall take effect shall be regarded as holding their positions under probationary appointment. Each person holding an office created by ordinance and serving for a stipulated term shall continue in such office until the expiration of such term, at which time such office shall be filled, pursuant to the provisions of this act. In the event that the city absorbs or assumes operation of an enterprise or function from, and theretofore conducted or performed by, the federal government, or any agency thereof, the state or another governmental sub-division thereof, or any private individual, business or agency, those employees who have been continuously engaged in such enterprise or function so taken over for not less than one year and who may be considered essential to its operation by the authority or officer of the city who has supervision of such new enterprise or function and the personnel director, shall be retained without preliminary or performance tests, and shall be regarded as holding their positions under probationary appointment, and shall thereafter be subject in all respects to the provisions of this act. The concluding sentence concerning employees engaged in an enterprise or function which the City "assumes operation of or absorbs" was added to the Charter by amendment in 1945, Special Act No. 431.

The District Court not only relied on Section 6 of the City Charter to reject the legitimacy of the City's basis for distinguishing between the two forces, but also inferred primarily from the City's disregard of the obligations imposed by Section 6 that the true motivation for the disparate treatment of the two forces was their different racial composition. The conclusion about deliberate discrimination also rested to some extent on other factors. The Court noted that the City had disregarded a regulatory letter issued by the Department of Housing and Urban Development (HUD) under the Model Cities Act, requiring fund recipients to incorporate jobs funded under the Act into permanent employment positions. The Court also relied on evidence that one White employee had been retained after a reclassification of her position without being required to take a new competitive examination.[5] Finally, the Court took notice of the City's generally "deplorable reputation" as a discriminatory employer, citing prior employment discrimination cases involving Bridgeport.

The conclusions concerning intentional discrimination also served as the basis for finding the City liable under 42 U.S.C. §§ 1981 and 1983.

The District Court also held the City liable for violating requirements of the Model Cities Act and CETA. Initially, the Court determined that implied private causes of action could be maintained under both statutes. The Model Cities Act violation stemmed from the City's failure to incorporate the Housing Police into the City's civil service system, as required by CDA Letter Number 11,[6] an administrative directive issued by HUD with respect to all positions funded under the Model Cities Act. The CETA violation concerned § 122(f) of CETA, 29 U.S.C. § 824(f) (Supp. II 1978), which proscribes an "artificial barrier to public employment." The Court concluded that the police civil service exam was an "artificial barrier" when applied to the Housing Police because, in the Court's view, Section 6 of the City Charter exempted them from such testing.

*Title VII*

■ We agree with the District Court that the undisputed facts show performance of equivalent duties and receipt of unequal benefits, and we are willing to assume that appellees have established a traditional *prima facie* case of discrimination by the City,[7]

---

5. In 1957 the City hired Florence Jepson as a "police investigator" and some of the evidence suggested that her duties consisted of work as a jail matron. The City created the position of "police woman" in 1969, and Mrs. Jepson was ineligible to take the competitive examination for that post because of her age. Nevertheless she was given the new position, without taking the test, which entailed a salary increase and, as found by the District Court, a change in duties from work as a matron to the full range of duties of a police officer. The City contended that the employee had been granted a waiver from taking the test, for a position merged into her prior post, for which she had competed successfully in an examination twelve years earlier. This instance was the only example the Court found in the forty-five years of the City's civil service system of an individual's receiving a civil service post without taking the necessary qualifying exam.

6. Section 2(c) of CDA Letter No. 11 provides:
   In the case of public employment generated in components of the comprehensive city demonstration program, financed in whole or in part by supplemental or other HUD funds, such jobs will be incorporated into the community's regular civil service system within a reasonable period of time not to exceed two years from the point that positions were filled. Actions to accomplish this will be initiated in each community within six months of the date of issuance of this Letter. *Such positions will be filled through a Model* Neighborhood resident recruitment and training system in conformity with the policies of this Letter and the positions will carry full public employee rights and benefits.
   CDA (Community Development Act) Letter No. 11, United States Department of Housing and Urban Development, *Model Cities Resident Employment and Training Requirements* (Nov. 1970).

7. The City disputes on appeal the finding that it was the employer of the Housing Police, citing a Connecticut Labor Board decision that the Housing Police were to negotiate their contract with the Housing Authority, *City of Bridgeport v. Bridgeport Housing Police Local 1303*, Case No. MPP-3081, Decision No. 1492 (Conn.Bd. Lab.Rel. Feb. 1, 1977), *appeal dismissed*, No. 115665 (C.P., Fairfield Cty. Jan. 31, 1978). We agree with the District Court that the City, and

see *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), even though this is the unusual case where the high minority percentage in the disfavored group results directly from deliberate affirmative action to recruit the Housing Police from minority residents of the housing projects. However, we disagree with the District Court in its ultimate conclusion that Title VII has been violated because we are satisfied that the City's use of civil service examinations as a qualification for hiring into the regular Police Department provides a complete defense to the Title VII claim.

■ An employer's use of a job-related examination does not violate Title VII even though it results in a disproportionately high percentage of minority applicants not being hired at all. It is difficult to see why the Housing Police, who had a fair opportunity to compete for the Police Department positions, have a valid Title VII claim when, instead of being offered no employment opportunity whatever, they were offered policing employment at benefits below those of the Police Department officers. Or, to put it another way, if a job-related test may be used to select those who will be employed, it may also be used to select those who will receive higher employment benefits. The rationale for doing so is especially strong in filling entry-level police positions because the virtual absence of lateral entry into the promotional ranks of police departments means that entry-level hiring not only fills entry-level positions, but also provides the pool from which senior ranks will eventually be filled. The City is entitled to offer higher benefits to those who

successfully complete the job-related selection process so that those with potential for advancement will be attracted to the entry-level ranks and will have an incentive to remain with the Police Department.

Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) (1976), not only permits valid tests but also specifically permits employers to apply different standards of compensation and other terms of employment pursuant to bona fide merit systems. Appellees are not, in this litigation, attacking the bona fides of the merit system for hiring into the Police Department.[8] As the District Judge recognized, this is not a hiring case. Indeed, the job-relatedness of the most recently used entry-level examination for Bridgeport police officers has been upheld in state court litigation. *Armeno v. Bridgeport Civil Service Commission*, No. 167722 (Super.Ct.Conn. July 28, 1978).

■ Our conclusion is not altered by the existence of the City Charter requirement that obliges the City to employ, without qualifying examinations, essential employees with one year on the job whenever the City assumes operation of a function previously performed by the federal government. This provision of the Charter appears never to have been construed by any state court, and it is far from certain whether it applies to the present situation where the City has used some of its own funds and later CDA and CETA funds to continue funding an activity previously funded with Model Cities funds. Moreover, even if applicable, it is uncertain whether the Charter provision requires anything more than a grant of civil service status, or whether it also requires absorption of federally funded employees on terms equal to those performing equivalent tasks. If these interpretive

not the Housing Authority, was their employer for purposes of all of the federal claims in this suit. As the record showed, the City Police Department supervised and directed the Housing Police, and the City set their wage scales and paid them. The Executive Director of the Housing Authority testified about that entity's lack of authority over wage rates: on one occasion when the Housing Authority agreed to a salary increase for the members of the force, raising their wage rates to the level of Police

Department officers, the City refused to pay that amount.

8. The one instance, disclosed by the record, when a White employee was accepted into a civil service position without the requirement of an examination, *see* footnote 5, *supra*, is an isolated occurrence, totally insufficient to undermine the bona fides of the Police Department's merit hiring system.

choices were critical to the decision in this case, it might be appropriate to have them made by the state courts, *see Harris County Commissioners Court v. Moore*, 420 U.S. 77, 82–85, 95 S.Ct. 870, 874–75, 43 L.Ed.2d 32 (1975). However, regardless of how expansively the state courts might construe the local Charter requirements, those provisions would not create federal law liability for affording higher benefits to those hired pursuant to civil service examination. If appellees are being denied any rights grounded in local law, they can vindicate such rights in the state courts.[9]

In rejecting Title VII liability in the circumstances of this case, we note the absence of any evidence that minority group members have been denied a full opportunity to compete for positions in the Police Department, or have been steered into positions with the Housing Police. On the contrary, it appears that virtually all members of the Housing Police have taken the examination for the Police Department, and those who passed have been hired. Moreover, it is undisputed that the reason for the minority composition of the Housing Police is not that minority group members have been steered to it as an alternative to the Police Department, but that it was organized as an affirmative action program to provide minority employment opportunity.

*42 U.S.C. §§ 1981 and 1983*

The District Court premised liability under 42 U.S.C. §§ 1981 and 1983 upon its finding of a Title VII violation. Because we reject that conclusion, we also reject the Court's conclusion that the City violated these two statutes.

*Model Cities Act*

The threshold issue with respect to the claim under the Model Cities Act is whether appellees have a private right of action to enforce its provisions concerning employment status. Private rights of action under the Act have thus far been limited to suits seeking enforcement of the Act's requirements for citizen participation. *See, e. g., Economic Development Corp. v. Model Cities Agency*, 519 F.2d 740 (8th Cir. 1975); *Bouchard v. Washington*, 514 F.2d 824 (D.C. Cir.1975). Whether or not the appellees' right to bring their claim for relief can be inferred directly from the Act, the Supreme Court has ruled that 42 U.S.C. § 1983 creates a private right of action for any claim that action has been taken under color of state law to deny a plaintiff a right secured by a federal statute. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2052, 65 L.Ed.2d 555 (1980).

On the merits of the claim, the Model Cities Act requires programs funded under it to meet all additional requirements established by the Secretary of HUD. 42 U.S.C. § 3303(a)(6) (1976). CDA Letter Number 11, promulgated by the Secretary under this authority, required the City to provide full civil service status within two years of hiring, for members of the Housing Police, since their jobs were originally funded by a Model Cities grant. As required by CDA Letter Number 11, the City endorsed the policy of the letter and adopted its requirements, recognizing its obligation to comply with those requirements in order to receive funds under the Act. Nevertheless, the City, without any justification, has failed to accord civil service status to the Housing Police.

9. We note the absence of any claim or evidence that the City was aware of any obligation imposed by Section 6 of the Charter to hire the Housing Police as members of the Police Department without requiring civil service examination. The District Court's interpretation of the Charter had not been previously adopted by any court or administrative agency. Nor had it been suggested even by the plaintiffs in this lawsuit. Section 6 of the Charter was first injected into this suit when the District Court issued its opinion granting a preliminary injunction. An entirely different situation would have been presented if the Charter had been authoritatively construed by the state courts to require hiring the Housing Police as City policemen without examination, and the City thereafter kept minority group members in the Housing Police, rather than accord them clearly defined local rights to employment in the Police Department. In such circumstances, the contention that the City's reliance on civil service testing requirements was a pretext for racial discrimination would be far more substantial.

The City's only defense to the appellees' claim to obtain their right to civil service status is an unpersuasive claim of laches, that appellees commenced this lawsuit in 1977, four years after the City was required to hire them as civil servants under the Act. We agree with the District Court that the four-year delay did not prejudice the City and did not indicate that the Housing Police had acquiesced in the City's violation. Consequently the defense of laches was not established. *See Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 215, 83 S.Ct. 1185, 1191, 10 L.Ed.2d 297 (1963); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2946 at 420 (1973).

While we affirm the District Court's ruling that the Housing Police members are entitled to civil service status, we think it is inappropriate for a federal court to attempt to determine the content of this state-created status. We therefore vacate all aspects of the District Court's remedy other than the bare requirement of civil service status. It appears that most, if not all, of the other aspects of the Court's remedy, including incorporation of the Housing Police members into the Police Department with equal pay and benefits, were designed to remedy the Title VII violation, which we have rejected. Upon remand, the District Court's decree should be limited to requiring civil service status for the appellees. Once that entitlement has been adjudicated, the District Court should relinquish its jurisdiction (save only for any necessary compliance remedies) and remit appellees to the state courts in the event of any dispute as to the nature of the rights to which they are entitled as a result of civil service status. *Cf. Chance v. Board of Examiners*, 561 F.2d 1079 (2d Cir. 1977).

### CETA

For purposes of considering appellees' claim under CETA, we will assume that *Maine v. Thiboutot, supra*, authorizes a private cause of action under § 1983 to remedy

state action denials of rights under CETA, despite our previous decision in *CETA Workers' Organizing Committee v. City of New York*, 617 F.2d 926 (2d Cir. 1980), rejecting a private right of action implied directly by CETA. And we need not pause to consider whether, even under *Thiboutot*, a litigant suing under § 1983 to enforce obligations imposed by some other federal statute may be obliged to exhaust administrative remedies created by that other statute. In any event, appellees' CETA claim fails on its merits.

The CETA claim, upheld by the District Court, is that the City's maintenance of the civil service examination, as applied to the members of the Housing Police, constitutes an "artificial barrier to public employment" within the meaning of 29 U.S.C. § 824(f) (Supp. II 1978). We disagree. CETA defines "artificial barriers to employment" to mean "limitations in the hiring . . . and other terms and conditions of employment which are not directly related to an individual's fitness or ability to perform the duties required by the employment position." 29 U.S.C. § 802(3) (Supp. II 1978). As with the Title VII claim, there is no contention that the entry-level police exam is not directly related to the individual's fitness or ability to perform the duties of police officer. *Cf. DeLarmi v. Borough of Fort Lee*, 132 N.J.Super. 501, 334 A.2d 349 (App.Div.1975) (rejecting similar challenge to civil service test under predecessor statute to CETA, Emergency Employment Act of 1971, 42 U.S.C. § 4876(c)(18)). The District Court found the test, even if job-related, to be an artificial barrier because of Section 6 of the City Charter, which the Court construed to dispense with civil service testing for the Housing Police members applying to the Police Department. As with the Title VII claim, even if the state courts should ultimately agree with this construction of local law, appellees would not thereby acquire enforceable rights under CETA.[10]

---

10. In view of our rejection of the CETA claim on its merits, we also need not consider the

City's contention, rejected by the District Court, that the obligation to remove "artificial

### Conclusion

Having affirmed only so much of the District Court's remedy as provides for the appellees to be promptly accorded civil service status, with whatever benefits and protections accompany that status under local law, we vacate the judgment and remand for entry of a revised decree consistent with this opinion.   No costs.

barriers" is enforceable, if at all, only against the Secretary of Labor, on whom is placed the initial responsibility to assure that sponsors of CETA projects remove such barriers.