FORMER SPECIAL PROJECT EM-
PLOYEES ASSOCIATION; Michael J.
Babashanian; Arthur L. Bailey, Jr.;
William M. Baxter; Joyce A. Bennett;
James D. Bradfield; William C. Carden;
Daniel J. Cholewa; Hubert C. Church,
Sr.; Emma C. Cotten; Victoria C.
Davidson; Horace C. Downing; Anna
J. Duggan; E.C. Esporas; Michael J.
Farrell; E.L. Foreman; Warren L.
Fowler; Levester H. Gaines; William
Giddens; Muriel L. Goodman; Joseph
H. Graf; Carolyn P. Harrell; Roy Har-
ris; Antonia C. Hayes; James T. Hayes;
Charles G. Hosay; Isabelle M. Issac;
Duncan H. Howard; Bernice O. Hus-
key; Norman N. James; J.J. Jarman;
Richard D. Johnson; James C. Jones,
Jr.; Catherine D. Kearney; John R.
Kois; Oscar Y. McClannan; Ralston
McInnis; Deborah E. Mapp; Ronald L.
Milbourne; Arthur Morris, III; Wil-
liam R. Morris; Earl F. Peterson; Clar-
ence E. Provaznik; Robert M. Randall;
Donna G. Sanders; Maurice Sanders;
Clarence E. Satchell; Anthony B. Si-
mon; Richard Thomas Snyder; Wil-
helmena B. Spicer; Jean S. Tatem; Cal-
vert Tynes; Robert A. Van; Jacqueline
Vincent; Richard A. Vogel; Ronald O.
Whitehurst; Carlton T. Williams; Wen-
dy P. Wilson, Plaintiffs–Appellants,

v.

CITY OF NORFOLK,
Defendant–Appellee.

No. 89–3506.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1990.

Decided July 19, 1990.

Jeremiah A. Denton, III, Virginia Beach,
Va., for plaintiffs-appellants.

Harold Phillip Juren, Deputy City Atty.,
Norfolk, Va., argued (Philip R. Trapani,
City Atty., Norfolk, Va., on brief), for de-
fendant-appellee.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and RUSSELL and WILKINS, Circuit Judges.

WILKINS, Circuit Judge:

The Former Special Project Employees Association [1] and its 57 individual members (collectively employees) appeal the judgment of the district court dismissing their complaint against the City of Norfolk, Virginia seeking declaratory and injunctive relief under the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C.A. §§ 3301, *et seq.* (West 1977) (Model Cities Act),[2] and 42 U.S.C.A. § 1983 (West 1981). The employees claim that the Model Cities Act and directives issued by the Department of Housing and Urban Development (HUD) created a private cause of action through which they could enforce their right to civil service status and pension credit. Because we find that the Model Cities Act did not create either a private cause of action under the statute or an enforceable right under 42 U.S.C.A. § 1983, we affirm.

## I.

The Model Cities Act provided federal funds to cities for HUD-approved, urban renewal projects termed "comprehensive city demonstration programs." 42 U.S. C.A. § 3301. Cities electing to participate in Model Cities Act funding were obligated to provide "maximum opportunities for employing residents of the area in all phases of the program, and [to provide] enlarged opportunities for work and training." 42 U.S.C.A. § 3303(a)(2). Additionally, pursuant to section 3303(a)(6), HUD was authorized to establish further requirements, found to be related and essential to the purposes of the Model Cities Act, for participating cities. These additional requirements were embodied in "CDA Letters" issued by HUD. Funding for each city's program was contingent upon satisfying the criteria set forth in section 3303. *See* 42 U.S.C.A. §§ 3304–3305.

On August 28, 1969, Norfolk entered into a grant agreement with the United States whereby it obtained funding under the Model Cities Act. Pursuant to this agreement, Norfolk established a centralized administrative unit to manage its program. Due to the temporary nature of the program, the administrative unit operated outside the city's regular civil service structure. In CDA Letter 2 issued in May 1969, HUD stated that "[s]taff included in the grant request should receive the same fringe benefits, such as retirement ... as are standard for other employees." In CDA Letter 11 issued in November 1970, HUD directed participating cities, including Norfolk, to incorporate Model Cities Act employees "into the community's regular civil service system within a reasonable period of time not to exceed two years from the point that positions were filled." The letter stated that these positions "will carry full public employee rights and benefits." Norfolk did not immediately comply with either CDA Letter 2 or 11.[3]

When the Norfolk program ended on June 30, 1974, some of the original employees of the administrative unit (not parties to this lawsuit) were transferred to regular civil service positions within Norfolk's infrastructure, while 29 others were transferred to jobs under two other federal pro-

---

1. The individual members of the Association are present and former employees of the City of Norfolk.

2. Congress subsequently consolidated and simplified several federal programs, including the Model Cities Act. *See* 42 U.S.C.A. § 5316 (West 1983). By January 1, 1975, Congress had ceased funding all Model Cities Act programs.

3. HUD issued a series of memoranda beginning July 29, 1971, which waived some of the requirements established in CDA Letter 11 for "Planned Variation" cities (waiver memoranda).

Norfolk was a Planned Variation city and these memoranda arguably terminated its obligation under CDA Letter 11 to incorporate Model Cities Act employees into its regular civil service system. We need not address the effect of the waiver memoranda, however, because we find that no enforceable rights were created for the employees under the statutory language of the Model Cities Act. For the same reason we do not address the effect of CDA Letter 2, which the employees assert also establishes their right to pension credit.

grams, the Housing and Community Development Act of 1974, 42 U.S.C.A. §§ 5301, *et seq.* (West 1983 & Supp.1990), and the State and Local Fiscal Assistance Act of 1972, Pub.L.No. 92–512, 86 Stat. 919 (1972), *amended by* 31 U.S.C.A. §§ 6701–6724 (West 1983) (repealed 1986). These 29 employees, as well as others subsequently hired under these two programs, were included in Norfolk's retirement system in 1982 and attained regular civil service status in 1985 and 1986.

The employees filed suit seeking retroactive civil service status with full employee benefits including pension credit as required by CDA Letters 2 and 11. They contend that the Model Cities Act and CDA Letters 2 and 11 required Norfolk to include them in its regular civil service system with full employee benefits and that this requirement continued in effect through the statutes governing the two federal programs into which they were transferred or subsequently hired. The district court rejected this claim, finding that no implied private cause of action to enforce this right was created under the Model Cities Act. Furthermore, the court held that if an enforceable right to civil service status and pension credit had been created by the CDA Letters, the requirement was not binding on Norfolk because of HUD's subsequent waiver memoranda. The court did not address whether the employees were entitled to enforce their rights under section 1983.

## II.

In determining whether a statute implicitly creates a private cause of action, the focal point of our inquiry is the intent of Congress to create one. *See Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). "[U]nless this congressional intent [to create a private cause of action] can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582,

67 L.Ed.2d 750 (1981). In *Thompson* the Court stated that the four factors set out in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), guide our inquiry into whether a private cause of action is implied in a statute. These factors are as follows:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). The first three of these factors "are ones traditionally relied upon in determining legislative intent." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Considering these three factors, in our view Congress did not intend to create a private cause of action under the Model Cities Act.

The employees contend that they are members of the class for whose special benefit the statute was enacted. Based on the congressional findings and declaration of purpose embodied in section 3301, which stated that a goal of the Model Cities Act was to improve the job and income opportunities for city residents, the employees argue that Congress intended to benefit them when it passed the Model Cities Act. Section 3301 states:

The Congress ... finds ... *that cities* ... do not have adequate resources to deal effectively with the critical problems facing them, and that Federal assistance ... is essential *to enable cities* to plan, develop, and conduct programs to improve their physical environment....

The purposes of this subchapter are to provide additional financial and technical

assistance *to enable cities* of all sizes … to plan, develop, and carry out locally prepared and scheduled comprehensive city demonstration programs … to expand housing, job, and income opportunities … and generally to improve living conditions for the people who live in such areas, and to accomplish these objectives through the most effective and economical concentration and coordination of Federal, State, and local public and private efforts to improve the quality of urban life.

42 U.S.C.A. § 3301 (emphasis added). The employees rely on *Members of the Bridgeport Hous. Auth. Police Force v. City of Bridgeport*, 85 F.R.D. 624 (D.Conn.1980), in which the court held that the Model Cities Act created a private cause of action, to support their assertion that they were the beneficiaries of the Model Cities Act. The *City of Bridgeport* court reasoned that Congress indicated its intent to benefit city residents by establishing goals such as expanded income opportunities and improved living conditions for residents. *Id.* at 633.

The question, however, "is not simply who would benefit …, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). Section 3301 indicates that the primary beneficiaries of the Model Cities Act were the cities. And, while Congress may have intended to benefit the residents of urban areas when it passed the Model Cities Act, this incidental benefit does not indicate that Congress intended to provide a private cause of action for the residents. *See Smith v. Reagan*, 844 F.2d 195, 201–02 (4th Cir.) (" '[T]he mere fact that the statute was designed to protect [certain individuals] does not require the implication of a private cause of action … on their behalf….' ") (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979)), *cert. denied*, 488 U.S. 954, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988).

In an analogous case, the Supreme Court stated that the Davis–Bacon Act, which included provisions mandating certain stipulations in construction contracts for the benefit of mechanics and laborers, did not create a private cause of action in favor of those individuals because the benefits were not direct. The Court stated:

Section 1 of the Davis–Bacon Act requires that certain stipulations be placed in federal construction contracts for the benefit of mechanics and laborers, *but it does not confer rights directly on those individuals.* Since § 1 is simply "phrased as a directive to federal agencies engaged in the disbursement of public funds," its language provides no support for the implication of a private remedy.

*Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772–73, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981) (citation and footnote omitted) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 693 n. 14, 99 S.Ct. 1946, 1955 n. 14, 60 L.Ed.2d 560 (1979)) (emphasis added). Similarly, other courts have held that funding statutes typically are not sufficiently focused on the benefiting class to confer federal rights on the members of the class. *Cf. Wehunt v. Ledbetter*, 875 F.2d 1558, 1563–66 (11th Cir.1989) (no private right of enforcement under federal-state welfare funding program), *cert. denied*, —— U.S. ——, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990); *Osborn v. American Ass'n of Retired Persons*, 660 F.2d 740, 744 n. 3 (9th Cir.1981) ("Recent Supreme Court cases suggest that the language of statutory spending directives is usually not sufficiently focused on the benefitting class to be properly construed as conferring rights on the class.").

Nor do we discern any indication of congressional intent in the statutory language or legislative history of the Model Cities Act to create a private cause of action. *See* H.R.Rep. No. 1931, 89th Cong., 2d Sess. 1–66, *reprinted in* 1966 U.S.Code Cong. & Admin.News 3999–4064. In *Transamerica Mortgage Advisors*, 444 U.S. at 18, 100 S.Ct. at 246, the Court stated that "while the absence of anything in the legislative history that indicates an intention to confer any private right of action is hardly helpful to the respondent, it does not automatically undermine his position." In *Touche Ross & Co.*, 442 U.S. at

571, 99 S.Ct. at 2486, however, the Court cautioned that "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best."

Finally, the structure of the Model Cities Act indicates that this statute was a typical federal funding statute promulgated pursuant to the spending power of Congress.[4] "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst*, 451 U.S. at 28, 101 S.Ct. at 1545 (dicta); *see Cannon*, 441 U.S. at 690–93, 99 S.Ct. at 1954–56; *Osborn*, 660 F.2d at 745 (quoting *Pennhurst*). Therefore, the structure of the Model Cities Act actually indicates that Congress did not intend to create a private cause of action.

### III.

The employees also contend that they may enforce statutory rights created under the Model Cities Act through 42 U.S.C.A. § 1983.[5] In *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980), the Court held that certain rights created under federal statutes are enforceable through section 1983. However, the section 1983 remedy for statutory violations of federal law is limited by two well-recognized exceptions. First, a section 1983 remedy is not available "where Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). Second, the private remedy is not available "where the statute did not create enforceable

rights, privileges, or immunities within the meaning of § 1983." *Id.*

Whether Congress has created an enforceable right is determined by its intent. *Smith v. Kirk*, 821 F.2d 980, 982 (4th Cir.1987). Neither the language of the Model Cities Act nor its legislative history, however, indicates that Congress intended to equip the statute with rights enforceable under section 1983.

Two of the leading Supreme Court cases on this issue are *Wright*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 and *Pennhurst*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694. In *Pennhurst* the Court ruled that the "bill of rights" section of the Developmentally Disabled Assistance and Bill of Rights Act of 1975 did not create enforceable rights because Congress did not clearly indicate that this section constituted a mandatory obligation on participating states. *Id.* at 18–20, 101 S.Ct. at 1540–41. The Court viewed that section as merely congressional "encouragement" that states comply with its provisions. *Id.* at 27, 101 S.Ct. at 1545. Thus, even though the rights it purported to grant were clear and specific, the Court determined that because the bill of rights section was not clearly a mandatory obligation, Congress did not intend to create an enforceable right.

In *Wright*, by contrast, the Court held that an enforceable right *was* created under the Brooke Amendment to the United States Housing Act of 1937. The Brooke Amendment "imposed a ceiling for rents charged to low-income people living in public housing projects, and, as later amended, provides that a low-income family 'shall pay as rent' a specified percentage of its income." *Wright*, 479 U.S. at 420, 107 S.Ct. at 769 (citation omitted). The Court

---

4. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). Under the Model Cities Act, cities could participate in the program by agreeing to abide by the terms of section 3303. Following a determination that the plans of those participating cities satisfied the criteria set out in the statute, the Secretary was authorized to make grants. *See* 42 U.S.C.A. §§ 3304–3305.

5. Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

found that the Brooke Amendment "was a mandatory limitation focusing on the individual family and its income." *Id.* at 430, 107 S.Ct. at 774. The Court described the Brooke Amendment as "sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not ... beyond the competence of the judiciary to enforce." *Id.* at 432, 107 S.Ct. at 775.

It is true that section 3303 of the Model Cities Act imposed mandatory obligations on participating cities such as Norfolk. And, as pointed out by the employees, this case is distinguishable from *Pennhurst* because Norfolk conditionally accepted the terms of section 3303 when it agreed to participate in the Model Cities Act program. The employees' claim stumbles, however, on the *Wright* requirement of specificity and definitiveness. Rights such as "maximum opportunities for employing residents of the area ... and enlarged opportunities for work and training" are obviously too vague to enforce in an adjudicatory proceeding. *See* 42 U.S.C.A. § 3303(a)(2). *Cf. Wilder v. Virginia Hosp. Ass'n,* — U.S. ——, ——, 110 S.Ct. 2510, 2522, 110 L.Ed.2d 455 (1990) (holding Boren Amendment to the Medicaid Act creates judicially enforceable rights); *Wright,* 479 U.S. at 432, 107 S.Ct. at 775 (holding rights created under the Brooke Amendment were specific enough for the judiciary to enforce). Even if such rights were enforceable, the putative rights to employment and training would not, in the absence of other statutory provisions not found in the Model Cities Act, include within them the rights to pension benefits and civil service status sought by appellants. Employment and training do not mean pension benefits and civil service status.

We recognize that this holding puts us at odds with the Second Circuit, which held in *Members of the Bridgeport Hous. Auth. Police Force v. City of Bridgeport,* 646 F.2d 55 (2d Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981), that rights created under the Model Cities Act were enforceable through section 1983. The Second Circuit found that CDA Letter 11, which directed participating cities to incorporate Model Cities Act employees

into their regular civil service systems, defined the rights granted in Section 3303 with sufficient precision to allow judicial enforcement. *Id.* at 62. However, *City of Bridgeport* was decided without the benefit of *Wright.* Additionally, *City of Bridgeport* conflicts with our decision in *Smith v. Kirk* where we held that "[a]n administrative regulation ... cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." *Smith v. Kirk,* 821 F.2d at 984. Thus, because section 3303(a)(2) does not provide an enforceable right, the contents of HUD's CDA Letters are irrelevant to our consideration of the employee's claim under section 1983.

### IV.

The other issues raised by the employees are either disposed of by our rulings herein or are without merit. For the foregoing reasons we affirm the judgment of the district court dismissing the complaint against Norfolk.

AFFIRMED.