**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-30337
_____

LOUISIANA LANDMARKS SOCIETY, INC.,

Plaintiff-Appellee,

VERSUS

CITY OF NEW ORLEANS, RIVERGATE DEVELOPMENT CORPORATION,
and HARRAH'S JAZZ COMPANY, INC.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

June 7, 1996

Before POLITZ, Chief Judge, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The City of New Orleans, the Rivergate Development Corporation, and Harrah's Jazz Company (collectively, "the defendants") appeal an order granting Louisiana Landmarks Society ("Landmarks") a permanent injunction against them. Concluding that Landmarks had no private cause of action to seek the injunction, we reverse, vacate the injunction, and dismiss for failure to state a cause of action.

In October 1971, the city applied for a federal open-space land grant under title IV of the Housing and Urban Development Act of 1970, Pub. L. 91-609, 84 Stat. 1770 (1970) ("HUD Act" or "Act"), *reprinted in* 1970 U.S.C.C.A.N. 2069, 2083-87.[1]  These grants were provided for the creation and maintenance of open-space areas inside urban centers.  *See* HUD Act § 701.  One of the uses for which grants were available was for "historic and architectural preservation."  *See id.* § 702(b)(4).

The grant application proposed that the city turn a parking lot into the Joan of Arc Plaza, a public area that would showcase a statue of Joan of Arc and a pair of cannons.  The statue and cannons were gifts from France.  The city ultimately obtained the grant and built the plaza.

Congress terminated the open-space land program in 1975, but it did not explicitly repeal § 705.[2]  This section required the approval of the Secretary of the InteriorSSnot HUDSSprior to the conversion of grant-assisted sites involving "historic or

---

Title IV of the 1970 act enacted the open-space land program at issue here.  Section 401, the only section in title IV, amended title VII of the Housing Act of 1961.  Section 401 replaced the existing text of title VII with nine new sections numbered from 701 to 709.  *See* 1970 U.S.C.C.A.N. at 2083-87.  These 700-series section numbers actually refer to sections of the 1961 act, the sections added by the 1970 amendments.  While Landmarks is formally suing under § 401 of the 1970 act, it is more convenient for us to cite to §§ 701-709 of the 1961 actSSwhen referring to portions of the 1970 amendmentsSSthan it would be to cite to § 401 of the 1961 act.  Thus, while we cite to sections of the 1961 act, we are formally interpreting the 1970 amendments to the 1961 act.

This section states:  "No open-space land involving historic or architectural purposes for which assistance has been granted under this title shall be converted to use for any other purpose without the prior approval of the Secretary of the Interior."  HUD Act § 705.  This section, while never repealed, has been omitted from the United States Code because of the termination of the grant program.  *See* 42 U.S.C.A. § 1500c-1 (West 1994).

architectural" purposes to uses other than those proposed in the grant application. *See id.* § 705.

On December 5, 1994, bulldozers, under Harrah's direction, began clearing the Joan of Arc Plaza, but without harming the statue or cannons. Landmarks obtained a temporary restraining order ("TRO") enjoining the defendants from converting the plaza to something other than its allegedly historic purposes.

After a hearing, the district court issued a permanent injunction, along the same lines as the TRO, against the defendants. The defendants moved to amend the judgment so that it would affect a narrow, precisely-defined area, and the court granted this motion. The defendants now appeal the permanent injunction, and Landmarks cross-appeals the amendment.

II.

It is undisputed that Congress did not expressly provide for a private right of action in passing the HUD Act. If any such cause of action exists, it must be one implied by the statute. The defendants argue that the Act implied no such right of action.[3]

*Cort v. Ash*, 422 U.S. 66, 78 (1975), established a four-factor

---

Landmarks did not respond in its appellate brief to the defendants' private-right-of-action argument, except for a single conclusionary reference in the text of its brief and a single accompanying footnote. It contended that the defendants had waived this argument below when they purported to waive their standing argument.

We cannot help but find Landmarks's position puzzling. Standing is a concept distinct from the concept of private rights of action. Furthermore, to the extent that Landmarks erroneously analyzed the implied-cause-of-action argument as a standing argument, it should have known that standing is jurisdictional and, therefore, non-waivable. Landmarks's decision to deem this issue waived has left us with only the benefit of the defendants' briefing and argument.

test for determining whether a federal statute implies a private right of action:

> (1) Is this plaintiff a member of the class for whose "especial" benefit the statute was passed? In other words, does the statute create a federal right for this plaintiff?

> (2) Is there any evidence of legislative intent, either explicit or implicit, to create or deny a private remedy?

> (3) Is it consistent with the legislative scheme to imply a private remedy?

> (4) Is the cause of action one traditionally relegated to state law so that implying a federal right of action would be inappropriate?

*See also Resident Council of Allen Parkway Village v. HUD*, 980 F.2d 1043, 1053 (5th Cir.) (applying *Cort* test), *cert. denied*, 114 S. Ct. 75 (1993). Furthermore, the Court explained in *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979), that the touchstone of the *Cort* analysis is the second factor, Congressional intent. *See id.* at 568; *see also Allen Parkway*, 980 F.2d at 1054; *Abate v. Southern Pac. Transp. Co.*, 928 F.2d 167, 169 (5th Cir. 1991) (quoting *Thompson v. Thompson*, 484 U.S. 174, 179 (1988)).

When analyzing a federal statute, we begin with the familiar presumption "that Congress did not intend to create a private right of action." *Allen Parkway*, 980 F.2d at 1053. Generally, a plaintiff asserting an implied right of action under a federal statute "'bears the relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the relevant statute.'" *Id.* (quoting *Victorian v. Miller*, 813 F.2d 718, 721 (5th Cir. 1987) (en banc)). Landmarks has failed to carry this burden.

4

Under the first *Cort* factor, we ask whether the plaintiff belongs to an identifiable class of persons upon whom the statute has conferred a substantive right. *Abate*, 928 F.2d at 169; *see Cannon v. University of Chicago*, 441 U.S. 677, 690 (1979). Even if a plaintiff can demonstrate membership in such a class, however, the crucial inquiry remains one of Congressional intentSS*i.e.*, whether Congress actually intended to create a private remedy. *See Thompson*, 484 U.S. at 179; *Touche Ross*, 442 U.S. at 568; *Abate*, 928 F.2d at 169 (quoting *Thompson*). In answering the question of Congressional intent, "as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself." *Touche Ross*, 442 U.S. at 568 (citations omitted).

In this case, Landmarks cannot demonstrate that it is a member of a class for whose special benefit the Act was passed. In the Act's statement of findings and purpose, Congress stated that the grant program established under the Act was intended

> to help curb urban sprawl and prevent the spread of urban blight and deterioration, to encourage more economic and desirable urban development, to assist in preserving areas and properties of historic or architectural value, and to help provide necessary recreational, conservation, and scenic areas by assisting State and local public bodies in taking prompt action to [*inter alia*] . . . acquire, improve, and restore areas, sites, and structures of historic or architectural value . . . .

HUD Act § 701(d). To the extent that there might be an identifiable class of "persons" mentioned in this statute, it would consist of "[s]tate and local public bodies"SSnot historical

5

preservation societies such as Landmarks.[4]  This conclusion is supported by the fact that the statute explicitly defines the terms "State" and "local public body."  *See* HUD Act § 709.

It is both true and insufficient that historical preservation societies are "a class that stands to gain *some* benefit from the regulations and penalties promulgated under these provisions." *Abate*, 928 F.2d at 169.  The statute, however, focuses on Landmarks "only diffusely."  *See id.*  In other words, it does not focus on historical preservation societies any more than it "focuses" on citizens at large.

Rather, the Act's provisions are framed "'as a general prohibition or a command to a federal agency.'"  *Id.* (quoting *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981)).  The Act directs the Secretary of Housing and Urban Development ("HUD")SSwith some assistance from the Secretary of the InteriorSSto execute a regulatory scheme consisting of (1) federal financial assistance to state and local public bodies and (2) restrictions attached to that assistance.  This grant program, prior to its termination, sought to benefit urban areas and communities generally.  While Landmarks, like any ordinary citizen, may derive an indirect benefit from the enforcement of the regulatory scheme, that attenuated benefit[5] does not rise to the

---

We emphasize that we are not suggesting that the statute implies a private right of action in favor of state and local public bodies.  Rather, we simply point out that the only "persons" identified in the text of the statute are state and local public bodies.

In contrast to the statute here, title IX of the Education Amendments of
(continued...)

6

level required to support implication of a private right of action. *See id.*[6]

Landmarks therefore has failed to establish that it falls within an identifiable class of persons for whose special benefit the Act was passed. Because *Touche Ross* instructs us that Congressional intent is always the critical inquiry in an implied-right-of-action analysis, *see* 442 U.S. at 568, we consider that *Cort* factor as well.

## B.

The most telling indicator of Congressional intent regarding this grant program is Congress's termination of it as of January 1, 1975. *See* 42 U.S.C. § 5316(a) (1995) (prohibiting new grants or loans after January 1, 1975, under SS*inter alia*SStitle VII of the Housing Act of 1961). While Congress did not explicitly repeal § 705SSthe provision governing conversion of grant-assisted land to other usesSSit did decide to pursue a different legislative agenda

---

(...continued)
1972SSthe statute from which the *Cannon* Court inferred a private right of actionSScreated a direct benefit for an identifiable class of persons: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a) (1990). This language has not been amended since the decision in *Cannon*.

In explaining the proposition that a stream of indirectly derived benefits does not flow from a private cause of action, the *Abate* court offered three supporting citations: *Till v. Unifirst Fed. Sav. & Loan Ass'n*, 653 F.2d 152, 158 (5th Cir. Unit A 1981); *United States v. Capeletti Bros., Inc.*, 621 F.2d 1309, 1314 (5th Cir. 1980); and *Rogers v. Frito Lay, Inc.*, 611 F.2d 1074, 1079-80 (5th Cir.), *cert. denied*, 449 U.S. 889, *and cert. denied*, 449 U.S. 889 (1980). *Abate*, 928 F.2d at 169. Prior to our decision in *Abate*, we had characterized these cases as "decisions in which this court denied private rights of action under *statutes that imposed duties of enforcement upon federal departments and agencies*." *Hondo Nat'l Bank v. Gill Sav. Ass'n*, 696 F.2d 1095, 1100 (5th Cir. 1983) (emphasis added).

regarding open-space land and to eliminate the grant program. Given the Supreme Court's general disapproval of implied private rights of action, it would be anomalous to infer one from a defunct federal grant program.

Furthermore, the provisions of the statute are framed "'as a general prohibition or a command to a federal agency.'" *Abate*, 928 F.2d at 169 (quoting *Coutu*, 450 U.S. at 772). Like the statute at issue in *Abate*, this one "creates no rights in favor of individuals"; rather, it "imposes duties on a federal agency and grants the agency the power to fulfill those duties." *Id.* Stated concisely, the language of the HUD Act is "duty-creating," not "right-creating" like the statute in *Cannon*. *See id.* at 169 n.3 (quoting title IX of the Education Amendments of 1972 ("title IX"), the statute from which the *Cannon* Court inferred a right of action). And, as the *Cannon* Court stated, "the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon*, 441 U.S. at 690 n.13.

Moreover, we must not overlook the fact that this is a federal funding statute. As stated in the Act itself, Congress's purpose in enacting this statute was to "assist" state and local public bodies in creating and maintaining open-space land in urban areas. *See* HUD Act § 701(d). The statute created a grant program composed of federal-state and federal-locality partnerships, each of which properly was characterized as a contract between the federal government and a state or local public body. *Cf. Pennhurst State*

*Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (stating that "legislation enacted pursuant to [Congress's] spending power is much in the nature of a contract").

When dealing with a classic federal funding statute like this one, inferring a private right of action is disfavored: "[A]s a general rule, courts have been reluctant to infer a congressional intent to create private rights under appropriations measures." *Allen Parkway*, 980 F.2d at 1052. Thus, courts generally should decline to entertain claims by private persons that a state or local public body is not complying with a federal-state contract. "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst*, 451 U.S. at 28.[7]

In this case, because federal funds were given to the city as a one-time grant, Congress provided other means of enforcing the terms of the federal-state contract. It is apparent from the structure and text of the statute that Congress committed

---

Nothing in *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992), diminishes the force of this language from *Pennhurst* as it applies here. *Franklin* considered the availability of money damages as a remedy for violations of title IX. *See id.* at 62-63. While the Court acknowledged that the language from *Pennhurst* limited the remedies available under federal funding statutes in cases of unintentional discrimination, it declined to extend that limitation to cases of intentional discrimination. *See id.* at 74. This apparent limitation of *Pennhurst* speaks only to the availability of remedies where a statutory right of action already exists, as in the case of title IX. Indeed, as the *Franklin* Court itself stated, "the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place." *Id.* at 65-66 (quoting *Davis v. Passman*, 442 U.S. 228, 239 (1979)). Thus, nothing in *Franklin* casts any doubt on our general rule, *see Allen Parkway*, 980 F.2d at 1052, that inferring private rights of action from appropriations measures is disfavored.

administration of the grant program to the Secretary of HUD, who was to be assisted in some capacities by the Secretary of the Interior. Sections 701 to 709 of the Act repeatedly refer to the Secretary of HUD, carefully describing his duties in administering the grant program. Conspicuously absent is any mention of private, third-party enforcement of this contract between the federal government and the city. Rather, enforcement of the terms of the contract is committed to the executive authority of the Secretary of HUD.

In *Former Special Project Employees Ass'n v. City of Norfolk*, 909 F.2d 89 (4th Cir. 1990), the court held that the Model Cities ActSSanother HUD grant programSSdid not imply a private right of action. *See id.* at 92-93. The court cited approvingly cases from the Ninth and Eleventh Circuits holding that "funding statutes typically are not sufficiently focused on the benefiting class to confer federal rights on the members of the class." *Id.* at 92. The court also quoted with approval the language from *Pennhurst* disavowing implied private rights of action for noncompliance with the terms of a federal-state contract. *See id.* at 93.

The structure and language of § 705 constitute overwhelming evidence that Congress did not contemplateSSlet alone authorizeSSprivate enforcement of the open-space land program. Where analysis of the first two *Cort* factors leads to the conclusion that Congress did not intend to create a private right of action, we need not address the other two *Cort* factors. *See California v. Sierra Club*, 451 U.S. 287, 298 (1981) (citing *Touche*

10

*Ross*, 442 U.S. at 574-76).

We therefore hold that § 705 does not imply a private right of action.  Accordingly, we REVERSE, VACATE the permanent injunction, and render a judgment of dismissal for failure to state a cause of action.  Landmarks's cross-appeal regarding the scope of the injunction is DISMISSED as moot.