IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-20605
_____


DANIEL N. LUNDEEN,

Plaintiff-Appellant,


versus


NORMAN Y. MINETA,
Secretary of the United States
Department of Transportation;
THE METROPOLITAN TRANSIT AUTHORITY
OF HARRIS COUNTY, TEXAS; and
THE CITY OF HOUSTON,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____


May 8, 2002

Before WIENER and DENNIS, Circuit Judges, and LITTLE,* District
Judge.

WIENER, Circuit Judge:

Plaintiff-Appellant Daniel N. Lundeen appeals from the
jurisdictional dismissal of his suit against Defendants-Appellees
Norman Y. Mineta, the Secretary of the United States Department of
Transportation ("USDOT")[1]; the Metropolitan Transit Authority of

_____

* The Honorable F.A. Little, Jr., Chief District Judge for the
Western District of Louisiana, sitting by designation.

[1]The suit was originally against Mineta's predecessor, former
Secretary Rodney Slater.

Harris County, Texas ("Metro"); and the City of Houston ("Houston"). Agreeing with the district court's conclusion that it lacked subject-matter jurisdiction of this case, we affirm its dismissal of Lundeen's action.

## I. FACTS AND PROCEEDINGS

This suit was brought by a bicyclist opposed to a federally funded highway project in which Metro and Houston seek to renovate the portion of Louisiana Street, a downtown thoroughfare, that runs from West Gray to Lamar. The renovation would construct five one-way traffic lanes, with no restrictions on the leftmost three lanes, a high-occupancy-vehicle ("HOV") restriction for lane four, and a buses-only restriction for the fifth or rightmost lane. Metro and Houston have secured USDOT grants to fund this reconstruction (hereafter, "the Louisiana Project").

Lundeen, a bicyclist who is a citizen and resident of Houston, sued Mineta, Metro, and Houston to block the Louisiana Project. He asked the district court to enjoin operation of bus lanes, HOV lanes, and Metro buses on Louisiana Street; to enjoin Houston from enforcing its ordinance against bikes in bus lanes; and to declare that ordinance void and the Louisiana Project, as well as the operation of Metro buses as envisioned in that Project, ineligible for federal transportation funding. Lundeen's pleadings allege that because he is a bicyclist, his personal safety on and enjoyment of Louisiana Street are threatened by the Project as envisioned. He claims that he objected to the design of the

2

Project, only to be brushed off by both Metro and USDOT. On appeal, he states that the design and operation of the Louisiana Project "would threaten him with unreasonable risk of personal injury and death" and that the design is "deliberately calculated by Metro to discourage any use of [Louisiana Street] by bicycle [sic]."

Mineta and Metro moved to dismiss for lack of subject-matter jurisdiction and failure to state a claim on which relief could be granted. The district court granted their jurisdictional motions and dismissed the action. Lundeen timely filed a notice of appeal.

## II. ANALYSIS

We review a dismissal for lack of subject-matter jurisdiction de novo.[2] Our review here is tripartite. We begin with Lundeen's claim against Secretary Mineta.

A.    Jurisdiction over Mineta and USDOT

As we have previously noted,

The principle of sovereign immunity protects the federal government from suit except insofar as that immunity is waived. A waiver must be unequivocally expressed in statutory text and will not be implied. See Lane v. Pena, 518 U.S. 187, 192 (1996) (citations omitted).... Numerous Supreme Court opinions hold that courts should construe statutes against waiver unless Congress has explicitly provided for it.[3]

_____

[2]St. Paul Reinsurance Co. v. Greenberg, 134 F.3d 1250, 1252 (5th Cir. 1998); DeCell & Associates v. FDIC, 36 F.3d 464, 467 (5th Cir. 1994).

[3]Peña v. United States, 157 F.3d 984, 986 (5th Cir. 1998) (some citations omitted).

3

"Consequently, no suit may be maintained against the United States unless the suit is brought in exact compliance with the terms of a statute under which the sovereign has consented to be sued."[4] The burden is on Lundeen to show such consent, because he is the party asserting federal jurisdiction.[5] He has pointed us to no waiver in TEA-21 itself, its predecessors, or USDOT's authorizing legislation. We therefore confine our analysis of whether the district court had jurisdiction of Lundeen's action against Mineta to the single statute that Lundeen identifies as permitting him to sue the government: the Administrative Procedure Act ("APA").[6]

1. Judicial Review of "Agency Action"

Lundeen's basic argument assumes that, under the APA's scheme, USDOT's funding of the Louisiana Project is an "agency action." Mineta does not contest this assumption, perhaps because the term's definition is very broad and encompasses a funding decision.[7]

The parties sharply disagree, however, over whether judicial review is statutorily precluded. The APA generally provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning

---

[4]Koehler v. United States, 153 F.3d 263, 265 (5th Cir. 1998) (citing Soriano v. United States, 352 U.S. 270, 276 (1957)).

[5]Stockman v. Federal Election Comm'n, 138 F.3d 144, 151 (5th Cir. 1998).

[6]5 U.S.C. §§ 551 et seq. (2000).

[7]5 U.S.C. § 551(13) (defining "agency action" to include "relief"); 5 U.S.C. § 551(11)(A) (defining "relief" to include "grant of money").

of a relevant statute, is entitled to judicial review thereof."[8] In granting this entitlement, the statute clearly waives the official immunity of officers of the United States.[9] This certainly qualifies as a waiver of sovereign immunity. The APA expresses a broad exception, however, to its general rule: courts may not review an agency action when the "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."[10] Mineta urges that the first exception applies.[11] If it does, its statutory preclusion of judicial review would be jurisdictional in effect, requiring dismissal.[12] If neither exception applies, subject-matter jurisdiction exists, although it does so under the general federal-question statute, not the APA proper, which "does not create an independent grant of jurisdiction to bring suit."[13]

Our analysis under the first exception begins with the "strong presumption" that Congress intends that the federal courts review

---

[8]5 U.S.C. § 702 (2000).

[9]Id.

[10]5 U.S.C. § 701 (2000).

[11]The second exception is also at issue, but we do not reach it.

[12]Block v. Community Nutrition Inst., 467 U.S. 340, 353 n.4 (1984).

[13]Stockman, 138 F.3d at 152 n.13.

5

agency action.[14]  The agency can rebut this presumption by pointing to "specific language or specific legislative history that is a reliable indicator of congressional intent."[15]  The standard is whether congressional intent to preclude judicial review is "fairly discernible in the statutory scheme."[16]  In determining whether this is so, we cast a broad evidentiary net:  We look to the statute's language, structure, and legislative history, and also to the nature of the administrative action authorized.[17]

 2. <u>TEA-21</u>

The key provisions at issue entered the statute books in 1998 as parts of the Transportation Equity Act for the 21st Century ("TEA-21").[18]  In TEA-21, Congress re-authorized federal highway and transit funding.

 a. <u>Statutory Text</u>

TEA-21 amended the United States Code to add special language favoring bicyclists (23 U.S.C. § 217(g)) and to rewrite a highly reticulated transportation-planning scheme that explicitly precludes judicial review (23 U.S.C. §§ 134 and 135).  How these provisions interrelate is a matter of first impression.

---

[14]<u>Bowen v. Michigan Academy of Family Physicians</u>, 476 U.S. 667, 670 (1986).

[15]<u>Block</u>, 467 U.S. at 349 (citing cases).

[16]<u>Id.</u> at 351.

[17]<u>Id.</u> at 349.

[18]Pub. L. No. 105-178, 112 Stat. 107 (1998).

6

Sections 1203 and 1204 of TEA-21 amended §§ 134 and 135 to require that metropolitan regions (acting through metropolitan planning organizations) and states, respectively, develop transportation plans that establish priorities of projects for federal funding. Sections 134 and 135 delineate the scope of planning and provide a list of planning factors, several of which are relevant to this case; but they also protect that planning, and the planners' failure to consider a factor, from judicial review. The relevant language of section 134, the metropolitan-planning provision, state:

> (f) SCOPE OF PLANNING PROCESS.——
>    (1) IN GENERAL.——The metropolitan transportation planning process for a metropolitan area under this section shall provide for consideration of projects and strategies that will——
>       . . .
>       (B) increase the safety and security of the transportation system for motorized and nonmotorized users;
>       (C) increase the accessibility and mobility options available to people and for freight;
>       (D) protect and enhance the environment, promote energy conservation, and improve quality of life.
>    . . .
>    (2) FAILURE TO CONSIDER FACTORS.——The failure to consider any factor specified in paragraph (1) shall not be reviewable by any court under this title, subchapter II of chapter 5 of title 5, or chapter 7 of title 5 in any matter affecting a transportation plan, a transportation improvement plan, a project or strategy, or the certification of a planning process.[19]

Section 135's list of state planning factors and prohibition on judicial review of state planning are identical to this quoted

---

[19]23 U.S.C. § 134(f) (2000).

language.[20]  If these provisions were all that we had to construe, Lundeen would have no case.

Lundeen points to 23 U.S.C. § 217(g), however, which was amended by section 1202(a)(3) of TEA-21 to read, in pertinent part:

> § 217.  BICYCLE TRANSPORTATION AND PEDESTRIAN WALKWAYS.
> ...
> (g) PLANNING AND DESIGN.—
>     (1) IN GENERAL.—Bicyclists and pedestrians shall be given due consideration in the comprehensive transportation plans developed by each metropolitan planning organization and State in accordance with sections 134 and 135, respectively.  Bicycle transportation facilities and pedestrian walkways shall be considered, where appropriate, in conjunction with all new construction and reconstruction of transportation facilities, except where bicycle and pedestrian uses are not permitted.
>     (2) SAFETY CONSIDERATIONS.—Transportation plans and projects shall provide due consideration for safety and contiguous routes for bicyclists and pedestrians....[21]

Lundeen notes that, even though the first sentence of § 217(g)(1) refers back to §§ 134 and 135, which explicitly preclude judicial review, the second sentence of § 217(g)(1) does not.  Neither does § 217(g)(2).  He suggests that, as § 217(g)'s title suggests, the provision operates on two levels:  planning and design.  On this view, the provision not only requires that bicyclists receive consideration in the planning processes, which courts may not review, but also requires that bicyclists receive due consideration, when appropriate, in the design of particular projects.  Metropolitan and state plans developed pursuant to

---

[20]23 U.S.C. § 135(c) (2000).

[21]23 U.S.C. § 217(g) (2000).

8

§§ 134 and 135, Lundeen asserts, do not contain design details such as bike lanes. He reasons that when Congress required that "transportation...projects" afford bicyclists and bike routes "due consideration," and that bicycle transportation facilities "be considered, where appropriate, in conjunction with all... reconstruction of transportation facilities," Congress meant to impose a design requirement distinct from the planning requirement. Under this theory, because only the first sentence of § 217(g) refers back to §§ 134 and 135, the latter sections do not foreclose judicial review of design violations.

The district court rejected Lundeen's contention that § 217(g) imposes a judicially reviewable design requirement, stating that "Section 217(g) is relevant only in the context of § 134 and § 135, both of which unambiguously preclude judicial review. Accordingly, § 217(g) does not provide a basis for this Court's jurisdiction."[22] The district court quoted only the first sentence of § 217(g), however, and did not respond in detail to Lundeen's bifurcation argument, which focuses on the last two sentences.

The case with respect to § 217(g) alone is not open and shut, as § 217(g) is less than pellucid. Nevertheless, Lundeen's argument runs into several textual difficulties.

First, Lundeen's attempt to bifurcate § 217(g) ignores the consistency of language in that section's three sentences. All three use the terms "consider" or "consideration." The better

_____

[22]Op. at 4.

construction of § 217(g) gives this term a consistent meaning, maintaining uniformity of construction in all three sentences.[23]

Second, if "consider" and "consideration" do indeed mean the same thing throughout § 217(g), that meaning is to be found in §§ 134 and 135, to which § 217(g)'s first sentence refers. Both those sections require that metropolitan planning organizations and states consider various factors as they draw up plans.[24] To support his contrary interpretation —— that the meaning of "consideration" in §§ 134 and 135 is not imported into § 217 —— Lundeen fails to identify for us any other portion of TEA-21 or Title 23 that uses the term. Rather, he asserts that § 217(g) on its own establishes a new consideration requirement that is judicially reviewable. This is an energetic construction of the second two sentences at issue, given that neither of them specifies who —— which official or what agency —— shall give "due consideration" to facilities and routes for, and the safety of, bicyclists. The second sentence of § 217(g)(1) masks agency by using the passive voice: "Bicycle transportation facilities...shall be considered." Section 217(g)(2) states that "plans and projects shall provide due consideration," as though decisions are made by the plans and projects rather than by federal, state, and local agency officials, planners, designers, and engineers. The indeterminacy of these two

_____

[23]See <u>Sullivan v. Stroop</u>, 496 U.S. 478, 484 (1990) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.").

[24]See 23 U.S.C. §§ 134(f)(1) and 135(c)(1).

sentences reinforces our view that we should interpret "consider," as used throughout § 217(g), in light of §§ 134 and 135, to mean "consider during planning."

Third, we concede that § 217(g)(2) provides a modicum of support for Lundeen's bifurcated reading, because it is a separate paragraph (thus perhaps distinguishing its language from that of § 217(g)(1)), and because, taken in isolation, it might fairly be read to impose a definite requirement. The distinction from § 217(g)(1) is particularly important because that section refers to §§ 134 and 135, each of which explicitly states that failure to consider a factor —— such as safety —— in transportation planning is not judicially reviewable. These bans on judicial review are quite sweeping: failure to consider a factor "shall not be reviewable by any court under this title [or provisions of the APA] <u>in any matter affecting a transportation plan, a transportation improvement plan, a project or strategy</u>, or the certification of a planning process."[25] Neither party has cited any case deciding whether the phrase "any matter affecting a transportation plan ... [or] strategy" includes compliance with § 217(g), and we have found none. Thus we are left to our own devices to determine how to reconcile these two provisions.

The Supreme Court's reviewability test asks whether congressional intent to make an agency action judicially reviewable

---

[25]23 U.S.C. § 134(f)(2) (emphasis added); <u>see also</u> 23 U.S.C. § 135(c)(2).

11

is "fairly discernible" not just from statutory text, but also from structure, legislative history, and the nature of the administrative action alleged to be reviewable. We address each of these other indicators of intent.

b. Statutory Structure

The structure of Title 23 militates against Lundeen's bifurcated reading of § 217(g) in several ways. Lundeen's assertion that the planning processes established in §§ 134 and 135 do not address particular projects (or the implications of projects) for bicycles is belied by the text of those sections. As amended, §§ 134 and 135 state that the plans "shall provide for the development and integrated management and operation of transportation systems and facilities (including pedestrian walkways and bicycle transportation facilities) that will function as an intermodal transportation system."[26] Both metropolitan planning organizations and states are commanded to develop "transportation improvement programs" that "shall include," respectively, "priority list[s] of proposed federally supported projects" and "federally supported surface transportation expenditures."[27] The metropolitan planning organizations and states must each also develop long-range plans, with respect to which "citizens,...representatives of users of public transit, and other

_____

[26]23 U.S.C. §§ 134(a)(3) & 135(a)(3) (2000).

[27]23 U.S.C. § 134(h)(1)(A) & (2)(A) (2000); 23 U.S.C. § 135(f)(1)(A) & (2)(A).

12

interested parties" shall have "a reasonable opportunity to comment" on the plans in development.[28] As for its transportation improvement program, each metropolitan planning organization must provide an opportunity for comment during the plan's development, must provide a further notice-and-comment period before approving the plan, and must publish the plan annually.[29] The state then selects from the approved improvement plan the projects that will receive federal funds.[30] Lundeen's suggested bifurcation between planning and project design is thus not necessarily borne out by the statute's structure, although it may be reflected in the statute's implementation.

Unsurprisingly, Title 23 does mandate that federally-funded projects comply with federal standards.[31] In § 109(m), this Title even mandates that the Secretary of Transportation veto "any project...that will...have significant adverse impact on the safety for nonmotorized transportation traffic" unless the project provides for a reasonable alternate route or such a route already exists.[32] The record is devoid of any evidence on alternate routes,

---

[28]23 U.S.C. § 134(g)(4) (2000). The State-planning section has a similar provision, 23 U.S.C. § 135(e)(3)(A) (2000).

[29]23 U.S.C. § 134(h)(1)(B), (4), & (7) (2000). Each State must also permit interested parties to participate in the development of its improvement program. 23 U.S.C. § 135(f)(1)(C) (2000).

[30]23 U.S.C. § 134(h)(5) (2000).

[31]See generally 23 U.S.C. §§ 106, 109 (2000).

[32]23 U.S.C. § 109(m).

13

however, partly because Lundeen never mentioned § 109(m) in his complaint or in his briefs.  We therefore decline to address any violation of § 109(m).

Broadening our focus to Title 23 as a whole gives still further evidence against Lundeen's argument.  Even if we assume that § 217(g) does impose a design criterion independent of the planning processes specified in §§ 134 and 135, we see that Congress wrote that criterion into Title 23 Chapter 2, which generally governs highways that are <u>not</u> federal-aid highways authorized by Chapter 1.  Other provisions in Chapter 2 cover federal lands highways, forest development roads, defense access roads, the Inter-American Highway, territories highways, the Darien Gap Highway (which is in Panama), and a portion of the Alaska Highway that is in Canada.[33]  Any freestanding design criterion in Chapter 2 would more naturally apply to these highways than to federal-aid highways such as the Louisiana Project.  We are convinced that if it had wanted a putative, judicially reviewable, bicycle-safety criterion to cover federal-aid highways, Congress would have placed such a provision in either Chapter 1 (entitled "Federal-Aid Highways"), Chapter 3 ("General Provisions"), or Chapter 4 ("Highway Safety").  If § 217(g) does contain a design requirement independent of the planning processes in Chapter 1, the location of that requirement in Chapter 2 militates strongly

_____

[33]<u>See</u> 23 U.S.C. §§ 204, 205, 210, 212, 215, 216, and 218 (2000).

14

against applying the requirement to the federal-aid highways governed by Chapter 1. The structure of Title 23 thus evinces in several ways a congressional intent that the courts not review any violation of § 217(g) with respect to a federal-aid highway.

c. Legislative History

Lundeen has not cited any portion of the legislative history of TEA-21 in support of his interpretation of § 217(g). Our independent review of the history has unearthed no evidence supporting his interpretation of § 217(g) but has revealed some evidence supporting the district court's jurisdictional dismissal.

The current version of § 217(g) was enacted as part of TEA-21. Both the House and Senate versions of the bill contained essentially the same language as the current statute and thus shed little light on this question.[34] The committee and conference reports, however, are somewhat more illuminating.

The House report states merely that the bill "amends section 217 of title 23 to make a number of clarifying changes and to require that bicyclists and pedestrians be included in the planning process."[35] This report gives no hint of providing judicial review or imposing a separate design requirement.

---

[34]See Building Efficient Surface Transportation and Equity Act of 1998, H.R. 2400, 105th Cong. § 137 (1998); Intermodal Surface Transportation Efficiency Act of 1997, S. 1173 105th Cong. § 1110 (1997).

[35]H.R. REP. NO. 105-467, pt. 1, at 190 (1998). The House report discusses the House bill's amendment to 23 U.S.C. § 109(n) [sic — now § 109(m)], but — to repeat — Lundeen has not asserted a claim under that provision.

The Senate report states:

SUMMARY

The planning provisions in sections 134 and 135 of title 23 are amended to provide that bicyclists and pedestrians shall be given consideration in the comprehensive Statewide and metropolitan planning processes, and that the inclusion of bicycle and pedestrian facilities shall be considered, where appropriate and permitted, in conjunction with all new construction and reconstruction of transportation facilities.

DISCUSSION

The Intermodal Surface Transportation Efficiency Act of 1991 made progress to encourage bicycling and walking as alternative modes of transportation. This section builds on ISTEA by expanding the amount of funds available to be used for these purposes. The Department should work with the States to ensure that bicycling and pedestrian interests are represented in State and [metropolitan planning organization] decision making.[36]

This report's language is (1) inaccurate, because the provision it described did not amend §§ 134 and 135, but rather referred to them; (2) ambiguous, because it repeats the textual ambiguity on which Lundeen's bifurcation argument rests; and (3) merely hortatory, because it urges USDOT to help ensure that bicyclists are represented in planning. There is no suggestion that the Senate Environment and Public Works Committee envisioned judicial review of a bicycle-safety design criterion.

The conference committee adopted the House's proposed version of § 217(g) with modifications.[37] The conference report's description of the provision that amends § 217 is not on point

---

[36]S. REP. NO. 105-95, at 15 (1997).

[37]H.R. REP. NO. 105-550, at 409 (1998) (conference report), reprinted in 1998 U.S.C.C.A.N. 70, 81 (legislative history volume).

16

here,[38] but another passage is somewhat helpful.  The report clarifies that the conference committee meant for the provisions in §§ 134 and 135 that preclude judicial review — also enacted as part of TEA-21 — to be quite broad in their effect:  "The language clarifies that the failure to consider any specific factor in formulating plans, projects, programs, strategies and certification of planning processes is not reviewable in court."[39]

The legislative history thus confirms the impression given by the text.  By enacting TEA-21, Congress did not intend to create a judicially reviewable, bicycle-safety–design criterion; rather, it anticipated that the failure to consider specific factors in planning a particular transportation project — even bicycle safety — would not be judicially reviewable.

d.    Nature of Administrative Action

The last collateral source of evidence of congressional intent to create or deny a cause of action is the nature of the administrative action involved.  To the extent that § 217(g) does not refer back to §§ 134 and 135, it states that transportation plans and projects shall provide "due consideration for safety and [ ] routes for bicyclists," and that "bicycle transportation facilities be considered, where appropriate, in conjunction with

_____

[38]Id.

[39]H.R. Rep. No. 105-550, at 440, reprinted in 1998 U.S.C.C.A.N. at 113.

all...reconstruction of transportation facilities."[40] These phrases voice nebulous requirements: They guarantee no right to any individual bicyclist; they are minuscule elements of a reticulated statute which each year authorizes the construction of billions of dollars worth of transportation projects nationwide pursuant to careful, joint planning among all levels of government following public participation. It is highly unlikely, and not "fairly discernible" from the administrative action involved, that Congress intended to allow bicyclists and pedestrians, alone among all the interest groups affected by this statute, to sue USDOT for inadequately considering their safety.

In sum, the text of § 217(g) might, if read in a vacuum, combine with the presumption in favor of judicial review to make Mineta's decision to fund the Louisiana Project a judicially reviewable agency action under the APA. When read in the context of other provisions, statutory structure, legislative history, and the nature of the administrative remedy, however, § 217(g) does not permit judicial review. We affirm the district court's dismissal of Lundeen's APA suit against Mineta. Having done so, we decline to address the question, raised by the parties, whether the APA permits a plaintiff to name nonfederal defendants as it brings suit for review of an agency action.

---

[40]23 U.S.C. § 217(g).

18

<u>Private Right of Action</u>

Having determined that Lundeen cannot sue Mineta under the APA's express language, we must also determine whether Lundeen has an implied private right of action against Metro, Mineta, and Houston for injunctive and declaratory enforcement of § 217(g).[41] We begin with the standard "presumption that Congress did not intend to create a private right of action."[42] The plaintiff generally "bears the relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the relevant statute."[43]

The possibility of an implied right of action is analyzed under the four-part test announced by the Supreme Court in <u>Cort v. Ash</u>.[44] We have previously summarized that test as follows:

> (1) Is this plaintiff a member of the class for whose "especial" benefit the statute was passed? In other words, does the statute create a federal right for this plaintiff?
> (2) Is there any evidence of legislative intent, either explicit or implicit, to create or deny a private remedy?
> (3) Is it consistent with the legislative scheme to imply a private remedy?

---

[41]Such an action is possible against Mineta because the APA also removes the sovereign immunity of federal officers sued in their official capacity if the relief sought is other than monetary damages. 5 U.S.C. § 702.

[42]<u>Resident Council of Allen Parkway Village v. United States Dep't of Housing & Urban Development</u>, 980 F.2d 1043, 1053 (5th Cir. 1993).

[43]<u>Id.</u> (quoting <u>Victorian v. Miller</u>, 813 F.2d 718, 721 (5th Cir. 1987) (en banc)).

[44]422 U.S. 66, 78 (1975).

(4) Is the cause of action one traditionally relegated to state law so that implying a federal right of action would be inappropriate?[45]

"Under the first Cort factor, we ask whether the plaintiff belongs to an identifiable class of persons on whom the statute has conferred a substantive right."[46]  The issue is whether the statute "expressly identifies [a] class Congress intended to benefit"[47] or whether Congress has instead "framed the statute simply as a general prohibition or a command."[48]  Of significance to the instant case, § 217(g) mentions "bicyclists" as a class in the first sentence of § 217(g)(1), which refers back to provisions that explicitly bar judicial review.  Section 217(g)(1) goes on to specify that "bicycle transportation facilities...shall be considered," and § 217(g)(2) states that "plans and projects shall provide due consideration for safety and contiguous routes for bicyclists."  Again, "bicyclists" are explicitly mentioned as a class, making the question a close one; but on balance, we view § 217(g) as "duty-creating," not "right-creating."[49]

---

[45]Lousiana Landmarks Society, Inc., v. City of New Orleans, 85 F.3d 1119, 1122–23 (5th Cir. 1996).

[46]Id. at 1123 (citations omitted).

[47]Cannon v. University of Chicago, 441 U.S. 677, 690 (1979).

[48]Universities Research Ass'n v. Coutu, 450 U.S. 754, 772 (1981).

[49]Louisiana Landmarks, 85 F.3d at 1124; see also Abate v. Southern Pacific Transp. Co., 928 F.2d 167, 169 (5th Cir. 1991).

Even if § 217(g) did textually suggest that bicyclists may sue, however, the "touchstone of the <u>Cort</u> analysis...is the second factor, Congressional intent."[50] Lundeen has not cited any evidence of congressional intent to establish an implied private right of action, and our own analysis above suggests that Congress intended no judicial review whatsoever. This conclusion is reinforced by our rule that because a federal grant program is in the nature of a contract between the federal government on one side and states, regional authorities, and localities on the other, "courts generally should decline to entertain claims by private persons that a state or local public body is not complying with a federal-state contract."[51]

Lundeen has not referred us to <u>Cort</u>, much less briefed the implied-right-of-action issue generally. Instead, he has emphasized his APA claim, and chosen to view his claims against Metro and Houston as pendant to that claim. As judicial review of administrative action is presumptively favored, but implying a private right of action is presumptively disfavored, our ruling on Lundeen's APA claim virtually forecloses any possibility of a private right of action. Despite the fact that the burden is his, Lundeen has failed to explain why we should not view this case in light of the general principle that courts should hesitate to read rights of action into federal grant statutes. We therefore

---

[50]<u>Louisiana Landmarks</u>, 85 F.3d at 1123 (collecting cases).

[51]<u>Id.</u> at 1125.

21

pretermit consideration of the third and fourth Cort factors,[52] concluding that Lundeen has failed to carry his burden of showing that Congress intended to create a private right of action to enforce § 217(g).

C.   The Kyne Exception

Lundeen nevertheless asserts that the district court had jurisdiction of his suit under the exception acknowledged by Leedom v. Kyne.[53]  Under Kyne, even if — as here — relevant statutory language precludes jurisdiction, a plaintiff may secure judicial review "when an agency exceeds the scope of its delegated authority or violates a clear statutory mandate."[54]  We have interpreted Kyne as permitting injunctions "only in a very narrow situation in which there is a plain violation of an unambiguous and mandatory provision of the statute."[55]  Review under Kyne is permissible only if the agency's error "is of a summa or magna quality as contraposed to decisions which are simply cum error.  Only the egregious    error    melds    the    [agency's]    decision    into

---

[52]Id. ("Where analysis of the first two Cort factors leads to the conclusion that Congress did not intend to create a private right of action, we need not address the other two Cort factors.") (citing cases).

[53]358 U.S. 184 (1958).

[54]American Airlines, Inc. v. Herman, 176 F.3d 283, 293 (5th Cir. 1999).

[55]Id. (citations and internal quotation marks omitted).

22

justiciability."[56] Thus, to permit review, a <u>Kyne</u> error "must not simply involve a dispute over statutory interpretation."[57]

Given our statutory-interpretation result above, Lundeen has clearly failed to demonstrate statutory error of a <u>magna</u> or <u>summa</u> quality. At most he has strongly suggested that USDOT's funding of the Louisiana Project violates design guidelines that USDOT itself has written. Those guidelines, however, are not statutes.[58] USDOT's alleged violation of them is therefore not reviewable under <u>Kyne</u>.

### III. CONCLUSION

Lundeen cannot sue Mineta under the APA. Section 217(g) does not give a bicyclist or pedestrian a private cause of action on which to sue Mineta, Metro, or Houston. Pendant jurisdiction of Lundeen's state-law claims was therefore lacking. Lundeen's allegation that USDOT has violated its own guidance by funding the

---

[56]<u>United States v. Feaster</u>, 410 F.2d 1354, 1368 (5th Cir. 1969).

[57]<u>Kirby Corp. v Peña</u>, 109 F.3d 258, 269 (5th Cir. 1997) (quoting <u>Dart v. United States</u>, 848 F.2d 217, 222 (D.C. Cir. 1988)).

[58]Lundeen points to many excerpts from <u>Design Guidance, Accommodating Bicycle and Pedestrian Travel: A Recommended Approach; A US DOT Policy Statement on Integrating Bicycling and Walking into Transportation Infrastructure</u> (United States Department of Transportation, Federal Highway Administration), <u>available at</u> http://www.fhwa.dot.gov/environment/bikeped/Design.htm (last modified Nov. 6, 2001). On its face, this document does not purport to be even binding USDOT policy: "[T]he purpose of the Policy Statement is to provide a recommended approach to the accommodation of bicyclists and pedestrians that can be adopted by State and local agencies (as well as . . . Federal agencies) . . . as a commitment." <u>Id.</u> at 3.

Louisiana Project does not rise to the level of egregious error that the Kyne exception was designed to prevent.

The district court's jurisdictional dismissal is therefore AFFIRMED.